## JOHN LEONARD et al.

*v.*

## CHARLES BOSCH et al.

[Decided November 10th, 1906.]

1. A clause in a charter party that the vessel was to guarantee insurance at lowest regular rates should not be construed to mean that the vessel itself or the owners should provide insurance for which they were to be paid the regular rates, but that the owners guaranteed that insurance on the cargo by the owners thereof was procurable at the lowest regular rates.

2. In an action by the owners of a cargo to recover a deposit made by the owners of the vessel in lieu of insurance, evidence *held* to require a finding that the depositors and the agent of the owner of the cargo both intended that the deposit should be for the owners of the cargo, and was deposited pursuant to the terms of the charter party in execution of the clause that the charterers were not obliged to begin loading before the deposit in guarantee of insurance had been made.

3. Plaintiffs, being unable to procure insurance on a cargo of scrap iron to be shipped on defendants' vessel, executed a charter party through B., as their agent, providing that the vessel should guarantee insurance. at lowest regular rates; that the owners should deposit $23,000 in lieu of insurance. and that the charterers were not obliged to begin loading until the deposit was made. B., at the time, was traffic manager of a bridge company, which had a contract to purchase the scrap iron from plaintiffs on delivery at the port of discharge, and certain of the correspondence relating to the deposit which passed between defendants and B., through oversight or mistake, was addressed to him as traffic manager of the bridge company, defendants supposing that the latter was the owner of the cargo.—*Held*, that such mistake was not in the making, but

in the execution, of the contract, and that the deposit was in fact made for the benefit of plaintiffs, who were the owners of the cargo.

4. A contract of affreightment commences from the loading of the vessel, from which time each party is bound to the other for the full performance of the contract.

5. Where a charter party required the owners of the vessel to make a deposit in lieu of insurance, and declared that the charterers were to begin loading on the deposit being made, the charterers, on notice of the deposit, and on loading the vessel, took the risk thereof for the entire voyage, and were entitled to the benefit of the security for such period, or until insurance for their benefit was effected by the owners of the vessel.

Heard on bill, answer, replication and proofs.

Eight of the defendants, who were also eight of the eleven owners of a vessel on which complainants shipped a cargo, made two deposits (the first of $23,000 and the second of $2,800) with the Camden National Bank, another defendant, and payment of these deposits to complainants John Leonard & Company is sought by their bill. At the time of each deposit the bank signed a letter stating its object. The first letter, dated at Camden, New Jersey, November 1st, 1902, relating to the deposit of $23,000, was addressed to "Mr. Charles S. Belsterling, Traffic Manager American Bridge Co.," and was as follows:

"THE CAMDEN NATIONAL BANK,
"CAMDEN, N. J., Nov. 1st, 1902.
"Mr. Chas. S. Belsterling, Traffic Manager, American Bridge Co., 259 So. Fourth St., Phila.:

"DEAR SIR—The owners of the bark Primus have this day deposited with us the sum of twenty-three thousand (23,000) dollars, to be held by us to indemnify you in the event of the loss of the cargo of old iron loaded by you in the Primus, according to the terms of a certain charter party executed by L. St. Clare, master, and Paul Nobbe, agent for John Leonard & Company, dated October twenty-second, nineteen hundred and two. Liability in no case to exceed twenty-three thousand $23,000 dollars. The above-mentioned indemnity from loss is to be and remain in effect, as protection against loss of said cargo, from the time said bark Primus takes aboard said cargo, or any of said cargo is placed on lighters to be delivered on said bark, until full delivery of cargo at Philadelphia.
"Yours truly,
"FRANCIS C. HOWELL, Cashier."

The second letter, relating to the deposit of the further sum of $2,800, made twenty days later, is addressed to "Mr. Chas. S. Belsterling," without further description, and was as follows:

"THE CAMDEN NATIONAL BANK,
"CAMDEN, N. J., Nov. 21st, 1902.
*"Mr. Chas. S. Belsterling, 259 So. 4th St., Phila., Pa.:*

"DEAR SIR—The owners of the bark 'Primus' have this day deposited with us the further sum of twenty-eight hundred ($2,800) dollars, making in all twenty-five thousand eight hundred ($25,800) dollars, to be held by us to indemnify you in the event of the loss of the cargo of old iron loaded by you in the 'Primus,' according to the terms of a certain charter party executed by L. St. Clare, master, and Paul Nobbe, agent for Leonard & Company, dated October twenty-second, nineteen hundred and two, liability in no case to exceed twenty-five thousand eight hundred ($25,800) dollars. The above-mentioned indemnity from loss is to be and remain in effect, as protection against loss of said cargo, from the time said bark 'Primus' takes aboard said cargo, or any of said cargo is placed on lighters to be delivered on said bank, until full delivery at Philadelphia, Penn.          Yours truly,

"FRANCIS C. HOWELL, *Cashier.*"

Complainants, who were the charterers, in fact loaded the cargo, and Belsterling, who was at the time their agent, as well as the traffic manager of the bridge company, acted, or intended to act, on behalf of the complainants in arranging for the deposit, and not on behalf of the bridge company, who now formally disclaim any interest in the deposit.

On a suit at law brought by the complainants against the bank to recover both amounts as due to them on obligations created by these two letters, it was held by the court of errors and appeals, in *Leonard* v. *Camden National Bank, 70 N. J. Law (41 Vr.) 660 (1904),* that the party indicated by these writings as the beneficiary of the deposit was the American Bridge Company, which company was not a party plaintiff to the suit, and at law could not be substituted for the complainants. The circumstance that the second letter was addressed to Belsterling individually, and that in this second letter the bridge company was nowhere expressly named, was not referred to in the opinion as affecting the construction of the writings in regard to the parties indicated by the writings. It may be that the reference in the second letter to the first deposit, and the further statement

therein, that both deposits were held as one sum "to indemnify you in the event of the loss of the cargo loaded by you," was considered as requiring both letters to be construed together as intended on their fact for the benefit of the bridge company. Unless this view was taken, it is difficult to distinguish the case, so far as it relates to the construction of the written instruments, from the cases of *Kean* v. *Davis, 21 N. J. Law (1 Zab.) 683 (Court of Errors and Appeals, 1847)* and *Isham* v. *Cooper, 56 N. J. Eq. (11 Dick.) 398, 410 (Court of Errors and Appeals, 1897)*, where the written instruments were held to be equivocal on their face and the subject of oral explanatory evidence in a court of law. It was said in the opinion of Mr. Justice Dixon, in *Leonard* v. *Camden National Bank,* "that perhaps a court of equity might be persuaded by extrinsic circumstances that the real purpose of the parties was to protect the owners of a certain cargo shipped on a vessel owned by the depositors, whoever they might be, and thus, by reformation of the writings, secure indemnity to the plaintiffs as such owners." It was also held that the fund deposited with the bank belonged to the depositors, subject only to the claim of the beneficiary to indemnity, and that the right of the complainants to the fund should not be established in a proceeding to which the depositors were not parties. It was further held that the sole obligation of the bank was to hold the fund until the rights of the claimants were settled *inter sese,* and then to surrender the fund to the rightful claimants, and that a court of equity could give the appropriate remedy. The complainants' bill was thereupon filed against the depositors of the money, as well as the three owners of the vessel, and against the bank and the American Bridge Company, being all of the parties who have or may claim any interest in the deposit. The bill alleges the execution of a charter party between the owners of the vessel and the complainants, who were the owners of a cargo to be shipped by the vessel, in which charter party there was an agreement by the owners to deposit the sum of $23,000 with a depositary, in lieu of insurance, and that the deposits in question were made in pursuance of this agreement. This agreement was as follows:

"Vessel to guarantee insurance at lowest regular rates. Charterers not obliged to begin loading before deposit of twenty-three thousand dollars ($23,000) in guarantee of insurance has been made. Vessel responsible for any expenses caused by delay in making said deposit."

It is alleged that, in arranging with the owners the details for this deposit, Belsterling, who was the agent for complainants, acted for them; that Belsterling was at the same time also an agent (traffic manager) of the American Bridge Company, and that through oversight or mistake a portion of the correspondence was addressed to "Chas. S. Bersterling, traffic manager American Bridge Company," and that the contract of deposit was made not for the benefit of American Bridge Company, who had no interest in the deposit, but for the complainants, the owners of the cargo, as the owners of the vessel well knew. It is further alleged that the vessel with its cargo was lost on the voyage, and the deposit is payable to the complainants. The bill prays a reformation or correction of the letter or letters evidencing the contract between complainants and the bank, so as to express the fact that Bersterling was acting as complainants' agent, and not as agent of the bridge company, that the latter company may be declared to have no interest in the fund, and that the bank may pay it over to complainants, as the vessel with its cargo was worth more than the amount of deposit.

The bank, denying all knowledge of the circumstances of the shipment, admits holding the deposits on the terms and conditions set out in its letters to Belsterling, but says that at the time of the deposits it was informed that Belsterling was the traffic manager of the American Bridge Company, that it was not informed that he was the agent of the complainants, and did not know that he was acting for them, and that the address of the letter to Belsterling as traffic manager was not through oversight or mistake on its part. It admits, however, that it holds the money as depositary or custodian and is ready to pay it over as directed by the court. The American Bridge Company files an answer and disclaimer under its seal, disclaiming any interest, past or present, in the fund. The depositors of the fund (being eight of the eleven owners of the vessel) deny that it was agreed that the owners of the vessel should cause the deposits of $23,000

to be made in lieu of insurance, and allege that the only agreement made with the complainants was the charter party set out in the complaint, made between complainants and the owners by their agents; they admit the deposit of $25,800 in the bank "and deny that it was in pursuance of any other arrangement or agreement than that mentioned in the charter party." They deny that the deposit was arranged with the complainants, or with Belsterling as representing them, and allege that it was arranged with the American Bridge Company, through its traffic manager, Belsterling, without any knowledge or information or understanding that Belsterling in any way represented complainants.

They further allege that they meant and intended the letters in question to be written to the American Bridge Company, and that the bank in so writing them followed the instructions of the trustee of defendants, acting for them on making the deposit, except that in writing the second letter the instruction to address to Belsterling as traffic manager American Bridge Company was not followed, and it was addressed to him individually.

While the bill prays for the special relief of reformation of the letters in question, it also prays payment of the deposit to it, and adds the prayer for general relief. If, therefore, on the whole case disclosed at the hearing it is entitled to such payment, whether or not the letters be corrected or reformed, such relief will be within the scope of the pleadings.

*Messrs. McCarter & English,* for the complainants.

*Mr. Donges* and *Mr. French,* for the defendants Bosch and others.

*Mr. Howard M. Cooper,* for the defendant Camden National Bank.

EMERY, V. C. (after statement of issues).

The questions involved are mainly questions of fact, and to determine precisely the bearing and effect of these letters relating to the deposits upon the rights of the parties, it will be neces-

sary to examine in detail the circumstances under which they were made, including especially the previous writings passing between the parties or their agents, whether executed or not.

[After an examination of the evidence the opinion proceeds]:

Reviewing the entire evidence in the case, the written documents, executed as well as unexecuted, and the oral evidence bearing upon their execution, I reach the conclusion that in arranging for the deposit, Belsterling, on the part of the shippers, and Dr. Donges and Mr. Ferris, on the part of the owners, both intended that the deposit was to be made in pursuance of the terms of the charter party and in execution of the clause contained in the charter party that "the charterers not obliged to begin loading before deposit of $23,000 in guarantee of insurance has been made." The charter party itself not expressly providing for the precise form of the deposit, or for the execution of any further writing expressing its terms and scope, these terms and the scope of the guarantee were afterwards defined by the mutual agreement of both parties, evidenced by the certificate of deposit signed by the cashier of the bank, after these terms and conditions had been expressly discussed, and, in one particular point, changed after the first draft. It was not intended that any formal or written agreement between the parties themselves as to the deposit or its terms should be executed, but both parties understood the deposit to be the satisfactory execution of the contract relating thereto contained in the charter party, so far as related to the terms or scope of the indemnity. And I further find that both Belsterling, as complainants' agent, and Dr. Donges and Mr. Ferris, acting on behalf of the owners of the vessel, intended that the deposit should be made in order that the cargo might be loaded on the vessel and become subject to the terms of the charter party for the common benefit of the charterers and the owners of the vessel, and that the cargo was loaded by the agent of complainants at Havana in the belief on the part of both the shippers and the owners' agents that the same was loaded under the protection of a deposit under the charter party.

I conclude also that in contracting for and arranging the deposit both Belsterling, and Dr. Donges and Mr. Ferris for the

owners, intended the deposit to be made for the benefit of the owners of the cargo, and that Belsterling on his part, throughout the negotiations, acted, and intended to act, solely as the agent of John Leonard & Company as the owners of the cargo, and that on giving the orders to load the vessel, after receiving the letters of the bank, he supposed that John Leonard & Company, as the loaders of the cargo, were secured by the deposit as made for their benefit as loaders under the charter party. I find also that through mistake, due to oversight, Belsterling, at the time of directing the loading of the vessel, in completion of the owners' duty under the charter party, did not notice that the letters, by reason of the form of address, indicated, or might be construed to indicate, that the American Bridge Company was the person or party to whom the letters were directed, and for whom they were intended, as the loaders of the cargo, under the terms of the charter party, and that he accepted the letters and directed the loading under this mistake or misapprehension of their character or legal effect.

On the other hand, I find that Dr. Donges and Mr. Ferris also intended to make the deposit to carry out the provisions of the charter party that the terms and conditions of the deposit (as to the extent of the guarantee) were evidenced by the certificate, and that they also intended that the deposit should be made for the benefit of the owners of the cargo as charterers of the vessel. I further find that through some mistake or misapprehension, the cause of which has not been clearly disclosed, the address of the certificate or letter was written in the form adopted. There is no evidence whatever, on either side, of any oral discussion of the question of the ownership of the cargo, as between John Leonard & Company and the bridge company, pending the negotiations for the deposit, or of any reference to the ownership by the bridge company previous to the address on the first letter. In delivering the letters of the bank, or causing them to be delivered, to Belsterling, I think the owners intended an execution of the contract relating to deposits in the charter party, and that their trustee made the deposit for the benefit of the American Bridge Company, as the persons supposed to be the owners of the cargo, and for whom John Leonard & Company, the char-

terers, acted as agents. I do not think, however, that the evidence will justify the conclusion that the trustee intended to have the letters addressed to Belsterling as the agent of John Leonard & Company, but that the mistake on his part in reference to the letters was that he supposed the bridge company to be the owners of the cargo, and in that capacity to be entitled to the benefit of the deposit which they had agreed to make in order to get the cargo on board.

This being the mistake of fact which arose in reference to the execution of the letters relating to the deposit, the legal question arises as to its effect on the rights of the shippers and the owners of the cargo to the deposit, on the faith of which the cargo was loaded on the vessel by these owners, the complainants. If the letters were written contracts between the owners and the charterers relating to the deposit, the case, as to reformation of the letters, might perhaps come within the application of the rule that although rescission of a written contract may be granted on proof of mistake of one party, reformation of a written contract cannot be made except upon proof of a mutual mistake. *Green v. Stone, 54 N. J. Eq. (9 Dick.) 387, 395, &c. (Court of Errors and Appeals, 1896)*; *Herron v. Mullen, 56 N. J. Eq. (11 Dick.) 839 (Court of Errors and Appeals, 1898)*; *Lutjen v. Lutjen, 64 N. J. Eq. (19 Dick.) 773, 778 (Court of Errors and Appeals, 1902)*. The letters, however, were not, in form, and were not intended by either party to be, written contracts between the parties themselves relating to the deposits, but were, and were intended by both parties to be, acts in execution of the written contract relating to the deposit made by the charter party. Therefore the substantial and real question in the case is whether, notwithstanding the mistake or misapprehension on one side as to the address of the letter, and on the other as to the bridge company's ownership of the cargo, the complainants have, on the whole evidence, an equitable interest in this deposit as a deposit made to carry out the contract of the charter party relating to the deposit. As between the bank and the person to whom it was delivered, the certificate of deposit is conclusive evidence of their legal relation, but as between the shippers and the owners, no written agreement relating to the deposit was made

or executed, and the letters are only evidence in connection with the other evidence in the case as to the relation which these parties sustain to each other in reference to the deposit. Both parties now prove by oral evidence, outside of the letters, that as between each other they agreed that the terms and extent of the guarantee or indemnity should be as stated in the letter of the bank, and both sides agree in their evidence that the deposit was made in order to procure the loading of the vessel by the owners of the cargo. Therefore the mistakes in the address of both of the letters of the bank were not mistakes in any written contract between the parties, which are to be reformed, but are mistakes made in attempting to carry out a previous written contract by the charter party for a deposit, without which the owners' vessel would not have been loaded, and on the faith of which its loading was secured. So far as the owners of the vessel and the shippers, by themselves or through their agents, agreed on the terms and conditions defining the extent of the guarantee by the deposit, which terms are evidenced by the letters which both parties agreed on, the deposit so limited must be taken as a further limitation or definition of the contract for guarantee, and to bind both parties as to what in this respect the execution of the charter party requires.

As to the beneficiaries of the deposit, both parties agreed and intended that it should be made in execution of the charter party, and for the benefit of the owners who were loading the cargo under the charter party. The mistake of the owners of the vessel, or their agent, in directing the letters of the bank relating to the deposit, to be addressed to Belsterling individually, or as traffic manager of the American Bridge Company, as the person whom they supposed to be the owners loading under the charter party, and the mistake of the owners' agent in overlooking this address, prevented, perhaps, an actual concurrence or meeting of the minds of the owners of the vessel and of the cargo, in reference to the person who should be indicated, in the letters of the bank, as the owner, but this failure of the minds of the parties to agree did not annul or render ineffective the contract for the deposit itself, as made in fact for the purpose of carrying out the charter party and for the benefit of the owners loading on

the faith of it. The deposit being clearly made, and admitted to be made by the owners of the vessel or on their behalf, to secure the loading of the vessel by the charterers under the charter party, I think the latter are entitled to hold the deposit as so made for their benefit, without regard to any mistake made either by the bank or the owners in addressing the certificate or letters relating to the deposit to another party. The original proposal of Nobbe was that a deposit should be made in the name of John Leonard & Company. Suppose that a deposit had been made, intended to secure the owners, not in the name of John Leonard & Company, but in the name of a third party, who had no interest in the fund, whose name had been given by mistake of the owners of the vessel, and not corrected by the shippers through another mistake, could not Leonard & Company have shown that the fund was intended to carry out the contract with them and for their benefit, and have enjoined the third party from withdrawing the fund?

Counsel for the owners admitting that the deposit was made to secure the loading of the vessel, contend that this was the sole object of it, and that this having been effected, the terms of the letter (including its address, as being solely for the benefit of the bridge company) must be considered as alone defining its beneficiaries as well as its terms; that John Leonard & Company, being no parties to the letter or the contract created thereby, have no interest in the deposit, and that the only contract between complainants and John Leonard & Company is the contract to make a deposit in guarantee of insurance, which contract is still outstanding and unperformed, and for breach of which contract complainants have still an action at law. But this view overlooks, I think, the real situation as to this deposit and its substantial aspect as intended to be in performance of the charter party. And it overlooks, also, the distinctive character of the contract of affreightment made by the charter party and the effect of the loading under it. Such contracts commence from the loading of the vessel, and from the time the cargo is delivered to the vessel each party is bound to the other for the full performance of the contract. *3 Kent Com. 208; The Eliza Lines (United States Supreme Court, October Term, 1905), 199*

*U. S. 132.* After loading the master was obliged to perform the voyage, and the charterers, on their part, were bound to allow the cargo to proceed. Therefore the provision that the charterers were to load on deposit, compelled them, on loading, to take the risk of the vessel for the whole voyage, and they must, under the contract, be entitled to the benefit of the deposit as security for the whole voyage or at least until insurance for their benefit was effected by the owners of the vessel. The obligation of the shippers to procure, or attempt to procure, insurance for themselves, expired when the deposit was made, and the owners of the vessel not having themselves subsequently procured or intended insurance on behalf of the shippers, no question arises as to the right of the owners to withdraw the deposit, or of the shippers to be protected by it. The extent to which they were to be protected was fixed by the mutual agreement of the parties on making the deposit, and was expressed in the letters of the bank. The complainants must be declared to be the beneficiaries of this fund as owners of the cargo loaded on the vessel, and the bridge company not to have any interest in it. The equitable jurisdiction in the case is based, as it seems to me, on the second ground stated in Mr. Justice Dixon's opinion, viz., that the obligation of the bank created by these letters was to hold the fund for the settlement of the rights of the claimants *inter sese,* and then to surrender the fund to the rightful claimant, a remedy appropriate only to a court of equity. A reformation of the letters is not, as it seems to me, either required for the purpose of declaring the rights to the fund or appropriate to the relief.

I will advise a decree directing that complainants, as owners and shippers of the cargo, are the persons entitled to be secured by the deposit, and directing payment to them of the value of the cargo, less the rates for insurance. If there is any dispute as to this value on the evidence taken at the hearing, I will settle this question at the settlement of the decree. ·